

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*

*One Saint Andrew's Plaza*
*New York, New York 10007*

July 22, 2008

**By Hand and ECF**

Honorable Harold Baer, Jr.
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    United States v. Antonio Scott and O'Kene White
          08 Cr. 360 (HB)

Dear Judge Baer:

        The Government respectfully submits this letter memorandum in opposition to the following pretrial motions filed by defendants (collectively, the "Motions"):

        (1)      Defendant Antonio Scott's Motion to Suppress Statements;

        (2)      Defendant O'Kene White's Motion to Suppress Statements;

        (3)      Defendant Antonio Scott's Motion for Severance;

        (4)      Defendant O'Kene White's Motion for Severance; and

        (5)      Defendant O'Kene White's Motion to Dismiss the Indictment.

        For the reasons set forth below, Motions (3), (4) and (5) should be denied without a hearing.  Motion (1), Scott's Motion to Suppress Statements, should be denied in part without a hearing and need not otherwise be decided at this time because the Government does not intend to offer the challenged statement during its case-in-chief.  The Government assents to a hearing with respect to Motion (2),White's Motion to Suppress Statements, and at such a hearing the Government is prepared to prove that White's post-arrest statements were voluntary and were not obtained in violation of <u>Miranda</u>.

Honorable Harold Baer, Jr.
July 22, 2008
Page 2 of 14

I.    **Background**[1]

Each of the defendants is charged in Indictment 08 Cr. 360 (HB), a copy of which is attached hereto as Exhibit A, with Conspiracy to Commit Hobbs Act Robbery, Attempted Hobbs Act Robbery and Use of a Firearm in Connection with a Crime of Violence, in violation of Title 18, United States Code, Sections 1951, 924(c)(1)(A)(ii) & (iii) and 2. Scott is also charged with being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1).

As set forth in Complaint 08 Mag. 589, a copy of which is attached hereto as Exhibit B, the defendants were arrested when officers of the New York City Police Department ("NYPD") caught them fleeing an apartment where a home-invasion robbery was occurring. (See Ex. B at ¶ 5). During that robbery, the defendants and two persons working with them, all of whom were armed with handguns, forced their way into the apartment at gunpoint, tied up one woman and two children, held those persons at gunpoint and demanded money and marijuana. (Id. at ¶¶ 2-4). The defendants and the other armed men beat a fourth occupant of the apartment repeatedly about the head and face with their handguns, causing injuries, and also fired at least one shot in the apartment and threatened to fire more. (Id. at ¶ 2, 4). As the defendants fled the apartment, one of them was seen by the police to be carrying a handgun. (Id. at ¶ 5). The NYPD officers chased the defendants up a set of stairs, to the roof of the apartment building, where the defendants were found hiding and were arrested. (Id. at ¶ 5). When Scott was found on the roof he motioned toward White and stated, in substance, "He did it. He was holding me hostage."

Following their arrests, the defendants were advised of their Miranda rights. Copies of the Miranda forms for each defendant are attached hereto as Exhibit C. After being advised of their rights, both defendants made statements to NYPD Detectives. (See Ex. B ¶¶ 7-9). Copies of the defendants' written post-Miranda statements, including a photograph of Scott, whom White identified as being one of the robbers inside the apartment are attached hereto as Exhibit D. A copy of a May 6, 2008 discovery letter reflecting an additional post-Miranda, oral statement by White is attached hereto as Exhibit E. Defendants now move to suppress all of their post-arrest statements.

---

[1]  The information provided in this section regarding the offenses charged primarily consists of a recitation of the facts alleged in the Complaint. This information does not constitute a full proffer of the evidence that the Government intends to present at trial with respect to any of the elements of the offenses charged in the Indictment.

Honorable Harold Baer, Jr.
July 22, 2008
Page 3 of 14

II.    **Defendants' Motions to Suppress Statements**

    **A. Legal Standard**

        Statements made by a defendant during the course of custodial interrogation are inadmissible in the prosecution's case-in-chief absent the defendant's waiver of the rights specified in <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436, 479 (1966). Having been advised of those rights, however, a suspect may, of course, waive his <u>Miranda</u> rights and agree to be interviewed, and any statements made after such a waiver are admissible. To prove a valid waiver, the Government must show that the waiver was voluntary, and that the defendant was aware of the right being waived and the consequences of waiving that right. <u>See</u> <u>United States</u> v. <u>Jaswal</u>, 47 F.3d 539, 542 (2d Cir. 1995). The Government need only prove waiver by a preponderance of the evidence. <u>Colorado</u> v. <u>Connelly</u>, 479 U.S. 157, 168 (1986). A court may properly conclude that <u>Miranda</u> rights have been validly waived "if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension." <u>Moran</u> v. <u>Burbine</u>, 475 U.S. 412, 421 (1986) (internal quotation and citation omitted); <u>see also</u> <u>United States</u> v. <u>Bye</u>, 919 F.2d 6, 8-9 (2d Cir. 1990) (test is whether waiver was "product of an essentially free and unconstrained choice," and reviewing court must consider totality of the surrounding circumstances). A defendant's "statements taken in violation of <u>Miranda</u>, though inadmissible as part of the prosecution's case-in-chief, are nevertheless admissible for impeachment purposes where they are also voluntary and uncoerced." <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d 175, 184 (2d Cir. 2003) (citing <u>Oregon</u> v. <u>Hass</u>, 420 U.S. 714, 722-24 (1975)).

        In determining whether a confession is the product of coercion, courts must consider "the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." <u>United States</u> v. <u>Anderson</u>, 929 F.2d 96, 99 (2d Cir. 1991). A confession is "involuntary" within the meaning of the Fifth Amendment if it is obtained by "'techniques and methods offensive to due process' or under circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" <u>Oregon</u> v. <u>Elstad</u>, 470 U.S. 298, 304 (1985) (quoting <u>Haynes</u> v. <u>Washington</u>, 373 U.S. 503, 515 (1963). Thus, "coercive police activity is a <u>necessary predicate</u> to the finding that a confession is not 'voluntary.'" <u>Colorado</u> v. <u>Connelly</u>, 479 U.S. 157, 166-67 (1986) (emphasis added). Absent evidence of such governmental coercion, therefore, no hearing is required on a motion to suppress a confession. <u>United States</u> v. <u>Salameh</u>, 152 F.3d 88, 117 (2d Cir. 1998), cert. denied, 119 S.Ct. 885 (1999). Situations in which courts have found confessions "involuntary" for constitutional purposes almost invariably involve governmental acts that so pressured the defendant as to overbear his free will. For example, courts have excluded confessions obtained by means of violence or where "there was a credible threat of physical violence," <u>see</u>, <u>e.g.</u>, <u>Arizona</u> v. <u>Fulminante</u>, 499 U.S. 279, 287-88 (1991); <u>Beecher</u> v. <u>Alabama</u>, 389 U.S. 35, 36 (1967) (statement obtained after police held a gun to suspect's head); <u>Payne</u> v. <u>Arkansas</u>, 356 U.S. 560, 564-65 (1958) (statement obtained after police threatened to turn

Honorable Harold Baer, Jr.
July 22, 2008
Page 4 of 14

suspect over to an angry mob); <u>Brown</u> v. <u>Mississippi</u>, 297 U.S. 278, 281-82 (1936) (statement obtained after police whipped suspect), or where the defendant was deprived of certain needs or subjected to lengthy interrogation under custodial circumstances which impaired his ability to make a free choice. <u>See, e.g.</u>, <u>Malinski</u> v. <u>New York</u>, 324 U.S. 401, 403, 406-07 (1945) (statement obtained after forcing suspect to remain naked); <u>Reck</u> v. <u>Pate</u>, 367 U.S. 433, 441 (1961) (statement obtained after depriving suspect of adequate food, sleep, and contact with family); <u>Brooks</u> v. <u>Florida</u>, 389 U.S. 413, 414-15 (1967) (statement obtained after depriving suspect of food and keeping suspect naked in a small cell).

       A defendant seeking suppression of evidence "bears the burden of showing that disputed issues of material fact exist before an evidentiary hearing is required." <u>United States</u> v. <u>Castellano</u>, 610 F. Supp. 1359, 1439 (S.D.N.Y. 1985). Accordingly, a motion to suppress a defendant's statement must be supported by an affidavit of someone with personal knowledge and that affidavit must contain not just a "bald assertion that a statement was involuntary" but a "factual basis for such a characterization." <u>United States</u> v. <u>Mathurin</u>, 148 F.3d 68, 69 (2d Cir. 1998); <u>see</u> also <u>United States</u> v. <u>Viscioso</u>, 711 F. Supp. 740, 745 (S.D.N.Y. 1989) (allegations in support of motion to dismiss must be definite, specific, detailed and non-conjectural to justify the granting of a hearing). As a corollary to this requirement, unless the defendant's moving papers state sufficient facts which, if proven, would require granting the relief requested, no evidentiary hearing is necessary. <u>United States</u> v. <u>Carasquillo</u>, No. S1 98 Cr 927 (RWS), 2000 WL 45708, at *2 (S.D.N.Y. Jan. 19, 2000).

### B.  Scott's Motion to Suppress Need Not Be Decided

       Scott moves to suppress his post-<u>Miranda</u> statement to NYPD detectives (<u>see</u> Ex. D at 1) on the basis that, after being advised of his <u>Miranda</u> rights, he chose to invoke those rights and to remain silent. Because the Government does not presently intend to introduce the contested statement during its case-in-chief, the Government respectfully submits that the motion need not be decided at this time.[2] The Government reserves its right, however, to use the statement for impeachment purposes if Scott testifies at trial. Even assuming <u>arguendo</u> that the statement was taken in violation of <u>Miranda</u>, it is "nevertheless admissible for impeachment purposes" because it was voluntary and uncoerced. <u>Parsad</u>, 337 F.3d at 184; <u>see</u> also <u>Hass</u>, 420 U.S. at 722-24. No evidentiary hearing is necessary with respect to the voluntariness of the statement because Scott's affidavit does not state sufficient facts which, if proven, would establish that the statement was coerced or otherwise involuntary. <u>See</u> <u>Carasquillo</u>, 2000 WL 45708, at *2. In his affidavit, Scott alleges only that, after being advised of his <u>Miranda</u> rights, Scott "replied no" when asked "whether he would be willing to answer questions," and that Scott

---

     [2] Should circumstances change and the Government accordingly change its position prior to or during trial, the Government would of course consent to an evidentiary hearing to determine whether the statement would be admissible.

Honorable Harold Baer, Jr.
July 22, 2008
Page 5 of 14

never changed his mind after so stating.  (See Affidavit of Antonio Scott ¶¶ 3-4).  "Whether statements taken in violation of Miranda are the product of coercion," however, "goes beyond the mere fact that the statement violates Miranda."  Parsad, 337 F.3d 184.  Moreover, "the mere fact that a police officer takes a statement after a suspect invokes his right to remain silent does not, standing alone, render that statement the product of coercion."  Id. at 184-85.  Because Scott alleges only a bare Miranda violation, and his affidavit lacks any allegations of "coercive police activity" that is a "necessary predicate to the finding that a confession is not voluntary," there is no basis for precluding the use of Scott's statement for impeachment purposes. See id.; Connelly, 479 U.S. at 166-67 (1986).

Although Scott's motion seeks only to suppress his post-Miranda statement (see Affidavit of Curtis J. Farber ¶¶ 5, 7-10; Memorandum of Law in Support of Defendant Antonio Scott's Motion for Severance and Suppression at 2), the Government notes that it presently intends to offer against Scott the pre-Miranda statement that Scott made when he was found hiding on the rooftop.  As described above, after being found on the roof, Scott motioned toward White and stated, "He did it.  He was holding me hostage."  The Government intends to offer that statement against Scott at trial as a false exculpatory statement that is probative of Scott's consciousness of guilt.  See United States v. Aleskerova, 300 F.3d 286, 294 (2d Cir. 2002) ("evidence of false exculpatory statements . . . tends to prove consciousness of guilt."); United States v. Gordon, 987 F.2d 902, 907 (2d Cir. 1993) (same).

## C.  White's Motion to Suppress

White also moves to suppress his post-arrest statements (see Ex. D at 2,4; Ex. E at 1-2).  Unlike Scott, however, White does not assert that he was advised of his Miranda rights and chose to invoke his right to remain silent, instead White claims that he "was never properly advised of [his] Miranda rights prior to the taking of any alleged statements."  (See Affidavit of O'Kene White ¶ 4).  White also makes the conclusory assertion that "[a]ll alleged statements . . . were not voluntary and the result of illegal police conduct and activity."  (Id. ¶ 3).  White's bare-bones affidavit raises a disputed issue of material fact as to whether he was advised of his Miranda rights and the Government consents to an evidentiary hearing on that issue.  At such a hearing the Government will be prepared to show that White was adequately advised of his Miranda rights (as reflected in the Miranda warnings form which bears White's initials next to the word "yes" after each of those rights (see Ex. C at 2)) and that he made a knowing, voluntary and non-coerced waiver of those rights before making the challenged statements to authorities.[3]

---

[3]  In his affidavit, White also claims that he was "physically attacked and abused by certain of the arresting officers."  (See Affidavit of O'Kene White ¶ 4).  To date, the Government's investigation of White's claim has shown that allegation to be entirely baseless.  The Government anticipates that during any evidentiary hearing on White's Motion to Suppress, the evidence will establish that White's claim of abuse is perjurious.

Honorable Harold Baer, Jr.
July 22, 2008
Page 6 of 14


### III.    The Defendants' Motions For Severance Should Be Denied

Each of the defendants has filed a motion for severance, seeking to be tried in a separate proceeding from his co-defendant.  Specifically, Scott and White each  allege that they will be prejudiced by the introduction of certain of each other's statements at a joint trial because those statements will allegedly impermissibly incriminate them in violation of their respective Confrontation Clause rights.  Defendants' motions should not be granted.  At trial, the Government intends to introduce against each defendant only that defendant's respective statements.  Those statements do not facially incriminate the other defendant and therefore do not warrant severance.  Indeed, with a single possible exception, the statements that are to be offered in the government's case-in-chief require no redaction in order to comply with Bruton v. United States, 391 U.S. 123 (1968), and its progeny.  Each of the statements simply is not incriminating on its face with respect to the non-speaking defendant.  Accordingly, neither defendant will be improperly prejudiced at a joint trial by the introduction of the statements that the Government intends to use, and no severance is warranted.

#### A.    Applicable Law

While Federal Rule of Criminal Procedure 14(a) authorizes the Court to grant a severance "[i]f it appears that a defendant or the government is prejudiced by a joinder," Fed. R. Crim. P. 14(a), the Supreme Court has made clear that severance is warranted only if "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993).  Thus, "[f]or reasons of economy, convenience and avoidance of delay, there is a preference in the federal system for providing defendants who are indicted together with joint trials." United States v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003); see also Zafiro, 506 U.S. at 537.  Joint trials also "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." Richardson v. Marsh, 481 U.S. 200, 210 (1987).

The presumption favoring joint trials is particularly strong where, as here, "the crime charged involves a common scheme or plan" among all defendants. United States v. Girard, 601 F.2d 69, 72 (2d Cir. 1979); accord United States v. Cardascia, 951 F.2d 474, 482 (2d Cir. 1991).  A defendant seeking severance therefore shoulders the "extremely difficult burden" of showing that he would be so prejudiced by joinder that he would be denied a fair trial. United States v. Casamento, 887 F.2d 1141, 1149 (2d Cir. 1989) (quotation omitted).  It is not enough for a defendant to show that he "may have a better chance of acquittal in [a] separate trial[]." Zafiro, 506 U.S. at 540.

Honorable Harold Baer, Jr.
July 22, 2008
Page 7 of 14

In <u>Bruton</u> v. <u>United States</u>, 391 U.S. 123 (1968), the Supreme Court held that the admission of a non-testifying co-defendant's confession, naming the defendant as a perpetrator at their joint trial, violates the named defendant's Sixth Amendment right to cross-examination, notwithstanding a jury instruction that the statement can only be considered against the defendant who made it.  In <u>Richardson</u> v. <u>Marsh</u>, 481 U.S. 200 (1987), however, the Court held that redaction of the co-defendant's confession to eliminate any reference to the defendant is sufficient to eliminate any <u>Bruton</u> problem.  The Court in <u>Gray</u> v. <u>Maryland</u>, 523 U.S. 185 (1998), found that statements redacted so as to leave blanks or the word "delete" created a <u>Bruton</u> problem, because the "redacted confession with the blank prominent on its face '<u>facially</u> incriminat[es]' the defendant."  <u>Gray</u>, 523 U.S. at 196 (emphasis in original).  But the Court suggested that the statement "Me, deleted, deleted, and a few other guys," could appropriately be introduced as "Me and a few other guys."  <u>Id.</u>

The Second Circuit has consistently held that the introduction of a co-defendant's confession with the defendant's name replaced by a neutral noun or pronoun does not violate <u>Bruton</u> or the Confrontation Clause.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Alvarado</u>, 882 F.2d 645, 651 (2d Cir. 1989) (discussing how statements may be redacted to comply with <u>Bruton</u> and <u>Richardson</u>), <u>overruled on other grounds</u>, <u>Bailey</u> v. <u>United States</u>, 516 U.S. 137 (1995).  For example, in <u>United States</u> v. <u>Tutino</u>, 883 F.2d 1125, 1135 (2d Cir. 1989), the Court of Appeals affirmed a conviction based in part on a statement of a co-defendant that was redacted so that it referred to "others," "other people," and "another person."  The <u>Tutino</u> Court held that "a redacted statement in which the names of co-defendants are replaced by neutral pronouns, with no indication to the jury that the original statement contained actual names, and where the statement standing alone does not otherwise connect co-defendants to the crimes, may be admitted without violating a co-defendant's Bruton rights."  <u>Id.</u>; <u>see also</u> <u>United States</u> v. <u>Edwards</u>, 159 F.3d 1117, 1125-26 (8th Cir. 1998) (co-defendants' names replaced with neutral pronouns such as "we," "they," "someone," and "others"); <u>United States</u> v. <u>Smith</u>, 918 F.2d 1032, 1038 (2d Cir. 1990) ("As the statements are not 'facially incriminating' as to Smith and were accompanied by an appropriate limiting instruction, there was no error.") (citing <u>Alvarado</u>, 882 F.2d at 652-53).

The Second Circuit has emphasized that, in determining whether a proposed redaction is sufficient to pass muster under <u>Bruton</u>, courts should view the redacted statement <u>separate and apart</u> from any other evidence admitted at the trial.  Indeed, the Court in <u>United States</u> v. <u>Williams</u>, 936 F.2d 698  (2d Cir. 1991), reiterated that prior Second Circuit decisions

> have uniformly held that the appropriate analysis to be used when
> applying the <u>Bruton</u> rule requires that we <u>view the redacted</u>
> <u>confession in isolation from the other evidence introduced at trial</u>.
> If the confession, when so viewed, does not incriminate the
> defendant, then it may be admitted with a proper limiting

Honorable Harold Baer, Jr.
July 22, 2008
Page 8 of 14

instruction <u>even though other evidence in the case indicates that the neutral pronoun is in fact a reference to the defendant</u>.

<u>Williams</u>, 936 F.2d at 700-01 (emphasis added).  <u>See also</u> <u>United States</u> v. <u>Martinez-Mantilla</u>, 135 F. Supp.2d 422, 424-25 (S.D.N.Y. 2001) ("[T]he <u>Bruton</u> rule is not violated even where the interlocking of the redacted statements with other evidence at trial could conclusively lead to the identification of the individual referred to through neutral pronouns as the co-defendant; thus, the redacted statements must be viewed in isolation from other evidence to determine whether it is incriminating on its face.") (citing <u>Williams</u>, 936 F.2d at 700, and <u>United States</u> v. <u>Smith</u>, 198 F.3d 377, 385 (2d Cir. 1999)).

The decision in <u>Crawford</u> v. <u>Washington</u>, 51 U.S. 36 (2004), generally barring out-of-court testimonial hearsay, does not change this result.  Indeed, the Second Circuit has specifically rejected the proposition that <u>Crawford</u> modifies <u>Bruton</u> or <u>Richardson</u> in the context of a severance motion.  <u>See</u>, <u>e.g.</u>, <u>United States</u> v. <u>Lung Fong Chen</u>, 393 F.3d 139, 150 (2d Cir. 2004) ("we see no indication that <u>Crawford</u> overrules <u>Richardson</u> or expands the holding of <u>Bruton</u>"); <u>see also</u> <u>Haymon</u> v. <u>New York</u>, 332 F. Supp. 2d 550, 559 n.4 (W.D.N.Y. 2004) ("<u>Crawford</u> gives no indication that <u>Richardson</u> and its progeny have been abrogated in any way."); <u>United States</u> v. <u>Cuong Gia Le</u>, 316 F. Supp. 2d 330, 338 n.8 (E.D. Va. 2004) (rejecting argument that "<u>Crawford</u> overruled <u>Bruton</u> and its progeny" because "[s]uch a revolutionary change in criminal procedure jurisprudence was not announced in <u>Crawford</u> and it cannot be assumed that the Justices intended to overrule <u>Richardson</u> <u>sub silencio</u> [sic]").

## B.    Discussion

The defendants' motions for severance should be denied.  Here, each of the defendants seeks a separate trial, based on the Government's intention to admit certain post-arrest statements of the other defendant.  The defendants are asking for two separate trials in a case in which they are charged with acting together during the course of a single conspiracy to engage in the robbery charged in the Indictment.  Because the Government, in its case-in-chief, will primarily introduce statements that need no redaction in order to comply with the authorities discussed above (and one statement that will be minimally redacted), the defendants will suffer no undue prejudice from a joint trial.  Moreover, because granting the defendants' severance motions would require the Court and the Government to conduct two separate trials at which most, if not all, of the evidence would be repeated, the Court should conduct one joint trial in this case.

### 1.    Scott's Severance Motion Should Be Denied

As an initial matter, Scott bases his severance motion almost exclusively on the prejudice that he purportedly would suffer if the Government were to introduce a photograph of

Honorable Harold Baer, Jr.
July 22, 2008
Page 9 of 14

Scott which includes a written notation that White identified Scott as one of the perpetrators of the home invasion robbery charged in the indictment. (See Affidavit of Curtis J. Farber ¶¶ 11-14; Memorandum of Law in Support of Defendant Antonio Scott's Motion for Severance and Suppression at 2-3).[4]  The Government, however, does not intend to introduce that photograph or White's identification of Scott at trial and, accordingly, potential prejudice from the introduction of those pieces of evidence offers no basis for severance.  White made two other post-<u>Miranda</u> statements to law enforcement officers which the Government does intended to offer against White (with an appropriate limiting instruction).  In his first post-<u>Miranda</u> statement (the "Written Statement"), White said the following:

> We enter the apartment at about 8:20 pm.  All I do was tie the kids up for there [sic] safety and kept them inside the kitchen where I was with them for the whole time I was there. [Unintelligible] other was inside the room.  We got arrested about maybe 8:30 pm – 8:40 pm.  I am not sure what time it was to be exact.  It was at 655 East 233 Street first floor.

(See Ex. D at 2).  In his second post-<u>Miranda</u> statement (the "Oral Statement"), White stated, in substance, the following:

> On or about March 6, White was walking outside near the apartment where the robbery occurred.  While he was walking, White saw some young men who he recognized from his neighborhood and with whom he played basketball.  The young men told White to come into an apartment (i.e., the apartment where the robbery took place).  After going into the apartment, White noticed a girl on the floor and White went over to try to keep the children calm so that the others would not hurt them.  After White noticed that the other young men were wearing masks on their faces, he put his own green bandana on his face as a mask.

---

[4]  Scott asserts, in two sentences, that his defense, which consists of denying that he participated in the robbery, is "antagonistic" to "White's claim to have been inside of the subject apartment with Mr. Scott, but having participated in the crime in only a minor way."  Particularly in light of the fact that the disputed photograph and identification will not be offered into evidence, that assertion cannot support severance.  Moreover, in order to "make a showing of 'mutually antagonistic' or 'irreconcilable' defenses, the defendant must make a factual demonstration that acceptance of one party's defense would tend to preclude the acquittal of the other."  <u>United States</u> v. <u>Salameh</u>, 152 F.3d 88, 116 (2d Cir.1998) (per curiam).  Scott has made no such showing.

Honorable Harold Baer, Jr.
July 22, 2008
Page 10 of 14

(See Ex. E).

The introduction of the White's incriminating statements against White, and accompanied by an appropriate limiting instruction, offers no justification for severance. Indeed, neither the Written Statement nor the Oral Statement even requires redaction in order to comply with Bruton and its progeny. Neither of White's statements is facially incriminating as to Scott, as neither of them refer to Scott by name, or in any other way that specifically identifies him. (See Ex. D at 2; Ex. E at 1-2). Indeed, in his statements White does not specifically refer to anyone. (Id.). White states that "we enter[ed] the apartment" and he says that "[unintelligible] other was inside the room," and he also makes reference to "some young men" with whom he participated in the robbery. (Id.). Thus White's statements, as made, satisfy the standard set forth in that authorities discussed above, namely that a confession offered against a confessing defendant should not "facially incriminat[e]" his co-defendant. Gray, 523 U.S. at 196 (emphasis in original). In sum, White's  statements "standing alone do[] not otherwise connect [his] co-defendant[ ] to the crimes," and accordingly severance is not warranted. See Williams, 936 F.2d at 700 (quoting Tutino, 883 F.2d at 1135).

### 2.    White's Severance Motion Should be Denied

Like Scott, White bases his severance motion on the purported prejudice that he will suffer from the admission of his co-defendant's statements (offered against that co-defendant) at trial. As discussed above, however, the Government does not presently intend to offer Scott's post-Miranda statement during its case-in-chief.[5] The only statement that Scott made and which the Government presently intends to offer against him is Scott's spontaneous utterance (and the Government contends, his false exculpatory statement) when he was found on the roof, in which Scott stated, "He did it. He was holding me hostage," as he motioned toward White. Although Scott's statement, viewed "in isolation from the other evidence introduced at trial . . . does not incriminate" White, Williams, 936 F.2d at 700-01, in an abundance of caution, the Government proposes that Scott's statement be edited to state, "Another guy did it. He was holding me hostage." In addition to that change, the Government will not intentionally elicit evidence showing that Scott was motioning toward White when he made the statement. With those modifications, Scott's statement falls squarely within the universe of statements whose use is approved under Second Circuit case law. Indeed, even where the evidence admitted at trial "all but insured that a jury could identify the person referred to in [one defendant's] confession" as his co-defendant, the Second Circuit rejected the co-defendant's Confrontation Clause

---

[5]  In the event that Scott testifies at trial and is subject to impeachment by evidence of his post-Miranda statement, the Government submits that the redacted version of the statement (attached hereto as Exhibit F) would satisfy the relevant standard. See Tutino, 883 F. 2d at1135 (affirming use of statement redacted so that it referred to "others," "other people," and "another person.").

Honorable Harold Baer, Jr.
July 22, 2008
Page 11 of 14

challenge because "a jury would identify [the co-defendant] as the other 'guy' in [the] confession only if it disregarded the limiting instructions given by the district court." Williams, 936 F.2d at 701. Here too any claim of potential Confrontation Clause prejudice is necessarily premised on an assumption that the jury would ignore this Court's limiting instruction, and must likewise be rejected. As long as Scott's false exculpatory statement is accompanied by a proper limiting instruction, advising the jury to consider the statement only against Scott, the admission of that statement does not violate White's rights under Bruton. Id.; accord Martinez-Mantilla, 135 F. Supp.2d at 425.

## IV.    White's Motion to Dismiss Should Be Denied.

Defendant White seeks an order from this Court "dismissing this matter due to a lack of jurisdiction or nexus to a violation of a federal law." (Affirmation of Martin J. Siegel (hereinafter, "White Br. at___"), at 1). The basis of White's motion is somewhat unclear. White does not claim that the Indictment is facially invalid or otherwise defective, and he does not articulate any cognizable reason why this Court purportedly lacks jurisdiction over the federal crimes charged in the Indictment. Rather, it appears from the authorities to which White directs the Court, that he is seeking dismissal on the ground that the Government's evidence purportedly is insufficient as a matter of law to satisfy the interstate commerce element of the Hobbs Act Robbery charges in the Indictment.[6] That claim, however, is foreclosed by Second Circuit precedent that is directly on point which prohibits the dismissal that White seeks.

An indictment that is valid on its face cannot be challenged on the ground that it was based on inadequate or incomplete evidence. Costello v. United States, 350 U.S. 359, 363 (1956). "It is well settled that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998) (citing Hamling v. United States, 418 U.S. 87, 117 (1974), internal quotation omitted). An indictment "need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." Alfonso, 143 F.3d at 776. The Indictment in this case satisfies the relevant two-pronged standard and, therefore, is sufficient. White does not claim otherwise. Instead, he directs this Court's attention to two cases from the Tenth Circuit and one case from the Seventh Circuit where, "under certain limited circumstances" pretrial dismissals were affirmed notwithstanding the fact that, in granting those dismissals, the trial courts went "beyond the allegations of the indictment and ma[de] predicate findings of fact." See, e.g., United States v. Hall, 20 F.3d 1084, 1088 (10th Cir. 1994). Those authorities, however, cannot justify the

---

[6]  See White Br., at 5 (citing United States v. Hall, 20 F3d 1084 (10th Cir. 1994); United States v. Brown, 925 F.2d 1301 (10th Cir. 1991); United States v. Risk, 843 F.2d 1059 (7th Cir. 1988)).

Honorable Harold Baer, Jr.
July 22, 2008
Page 12 of 14

relief that White seeks.  In a case that is materially indistinguishable from this one, the Second
Circuit has rejected precisely the type of inquiry into the sufficiency of the Government's
evidence that White urges here.

        In United States v. Alfonso, 143 F.3d 772 (2d Cir. 1998), the Second Circuit
reversed a trial court's pretrial dismissal of an indictment for "fail[ing] to satisfy the
jurisdictional requirement of the Hobbs Act," and remanded the case with instructions to
reinstate the indictment in its entirety. 143 F.3d at 775, 778.[7]  Specifically, the Second Circuit
held that, "in the circumstances presented a pretrial ruling on the sufficiency of the evidence with
respect to the Hobbs Act's jurisdictional element was not appropriate." Id. at 777-78.  In so
holding, the Court set forth the "well-settled" two-pronged test for the sufficiency of an
indictment, and held that the indictment met that standard.  Id. at 776.  The Court noted that
"[t]he indictment does not specify what it was that defendants allegedly conspired to steal or
precisely how the conspiracy would have affected interstate commerce.  Rather, it alleges in
conclusory terms that defendants conspired to commit robbery and thereby affected interstate
commerce." Id.  In light of long-standing precedent in this Circuit, the Court held that the
jurisdictional allegation was sufficient, and the Court stated, "We have never held that an
indictment alleging a violation of the Hobbs Act must specify the precise nature of the effect
upon interstate commerce that the government intends to prove at trial and we decline to do so
now." Id.  The Second Circuit went on to explain the trial court's error in looking beyond the
four corners of the indictment in deciding the motion to dismiss:

> To the extent that the district court looked beyond the face of the
> indictment and drew inferences as to the proof that would be
> introduced by the government at trial to satisfy the Hobbs Act's
> jurisdictional element, we hold that, in the circumstances
> presented, such an inquiry into the sufficiency of the evidence was
> premature.  Unless the government has made what can fairly be
> described as a full proffer of the evidence it intends to present at
> trial to satisfy the jurisdictional element of the offense, the
> sufficiency of the evidence is not appropriately addressed on a
> pretrial motion to dismiss an indictment.

Id. at 776-77 (emphasis added).  The Court further explained that, "[i]n the case of a Hobbs Act
prosecution, the requirement of an effect on interstate commerce is itself an element of the
offense charged" which "ordinarily . . . is not appropriately decided on a motion to dismiss" and
which "should be determined at trial." Id. at 777 (internal quotations omitted).

---

[7]  The defendant in Alfonso had filed a motion to dismiss on other grounds; the trial court
denied the motion on those grounds, but granted it on the basis of the jurisdictional issue which it
raised sua sponte.  Alfonso, 143 F.3d at 775.

Honorable Harold Baer, Jr.
July 22, 2008
Page 13 of 14

      This case is materially indistinguishable from <u>Alfonso</u>. The dispositive issue that required reversal in <u>Alfonso</u> was the fact that, at the time that the trial court granted a dismissal for insufficient evidence, the record did not contain all of the Government's evidence on the jurisdictional issue. <u>Id</u>. at 776-77. This case is no different. Here, the Government also has not "made what can fairly be described as a full proffer of the evidence that it intends to present at trial to satisfy the jurisdictional element of the offense" and, accordingly, the sufficiency of that evidence is not properly before this Court. <u>See id</u>. Accordingly, White's motion to dismiss must be denied. <u>See id</u>.; <u>see also</u> <u>United States</u> v. <u>Remire</u>, 400 F. Supp. 2d 627, 630 (S.D.N.Y. 2005) ("[W]hether the government established the requisite jurisdictional nexus for a Hobbs Act violation is a fact-based inquiry that can only be resolved after the government has put forth all of its evidence related to jurisdiction."); <u>United States</u> v. <u>Luguis</u>, 166 F. Supp. 2d 776, 779 (S.D.N.Y. 2001) (denying motion to dismiss because "the Court need not reach the question whether the Hobbs Act jurisdictional requirement has been satisfied. The appropriate time for defendant's Hobbs Act motion is at the close of the government's case-in-chief or of all the evidence or after the jury's verdict").

## V.    <u>Potential In-Court Identifications</u>

      In their moving papers, Scott and White each refer to the possibility that the robbery victims in this case might make in-court identifications of the defendants. Each defendant notes that the victims have not previously identified them in any pre-trial identification procedure. Scott reserves his right to object to any identification during trial, and White offers the conclusory assertion that any in-trial identification "would utilize a highly suggestive procedure," and "[t]herefore, if the prosecution will attempt an in-court identification of the defendants by the alleged victims, [an independent source] hearing should be conducted." (White Br. at 3-4). Although this issue is presently not ripe for decision, the Government notes that White's assertion is based on a misapprehension of both the suggestivity of an in-court identification and the circumstances under which an independent source hearing is required. As an initial matter, contrary to White's assertion that any in-court identification would necessarily utilize a suggestive procedure, the Second Circuit has recognized that "relatively minor steps" can ensure that an in-court identification is not unfair. <u>United States</u> v. <u>Archibald</u>, 734 F.2d 938, 942 (2d Cir. 1984). Moreover, "when a defendant is sufficiently aware in advance that identification testimony will be presented at trial and fears irreparable suggestivity . . . his remedy is to move for a line-up order to assure that the identification witness will first view the suspect with others of like description." <u>Id</u>. (Quoting <u>United States</u> v. <u>Brown</u>, 699 F.2d 585 (2d Cir. 1983)). Further, where no pretrial identification precedes the in-court identification an independent source hearing generally is unnecessary because "trial counsel ha[s] the opportunity to address the reliability of the in-court identifications during the course of the trial, presumably through cross examination." <u>Castillo</u> v. <u>Walsh</u>, 443 F. Supp. 2d 557, 568-69 (S.D.N.Y. 2006). In any event, in order to afford the defendants an opportunity timely to request a line-up order if the Government intends to offer an in-court identification of either defendant, the Government

Honorable Harold Baer, Jr.
July 22, 2008
Page 14 of 14

will provide notice of such intent in advance of whatever date this Court sets, or the parties agree upon, for the filing of motions in limine.

## VI.    Conclusion

For the foregoing reasons, the Government respectfully requests that the Court deny each of the following motions without a hearing:  Antonio Scott's Motion for Severance; O'Kene White's Motion for Severance; and O'Kene White's Motion to Dismiss the Indictment. The Government also requests that the Court deny Antonio Scott's Motion to Suppress Statements without a hearing, insofar as that motion challenges the voluntariness of his post-Miranda statement, and otherwise deny the motion as moot.  The Government finally requests that the Court schedule an evidentiary hearing with respect to O'Kene White's Motion to Suppress Statements, and respectfully reserves the right to request post-hearing briefing regarding any factual or legal issues that arise during the hearing.

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney


By:    /s/  Jason B. Smith
Jason B. Smith
Assistant United States Attorney
(212) 637-1026

cc:    Curtis J. Farber, Esq. (by ECF and electronic mail)
Martin J. Siegel, Esq. (by ECF and electronic mail)

**EXHIBIT A**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CRIM 360

- - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA        :        INDICTMENT

            -v.-                :        08 Cr.

ANTONIO SCOTT, and              :
O'KENE WHITE,
    a/k/a "Dread,"              :

            Defendants.         :

- - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:  APR 2 3 2008

COUNT ONE

The Grand Jury charges:

1.  In or about March 2008, in the Southern District of
New York and elsewhere, ANTONIO SCOTT and O'KENE WHITE, a/k/a
"Dread," the defendants, and others known and unknown,
unlawfully, willfully and knowingly did combine, conspire,
confederate, and agree together with each other to commit
robbery, as that term is defined in Title 18, United States Code,
Section 1951(b)(1), and would and did thereby obstruct, delay,
and affect commerce and the movement of articles and commodities
in commerce, as that term is defined in Title 18, United States
Code, Section 1951(b)(3), to wit, SCOTT and WHITE, together with
others known and unknown, conspired to commit an armed robbery,
in the Bronx, New York, of persons engaged in narcotics
trafficking.

OVERT ACTS

2.  In furtherance of the conspiracy, and to effect the
illegal object thereof, the following overt acts, among others,

were committed in the Southern District of New York:

        a.  On or about March 6, 2008, in the vicinity of 233rc Street, Bronx, New York, ANTONIO SCOTT and O'KENE WHITE, a/k/a "Dread," the defendants, and others known and unknown, forcibly entered an apartment in order to obtain narcotics and narcotics proceeds.

        b.  On or about March 6, 2008, while inside an apartment in the vicinity of 233rd Street, Bronx, New York, SCOTT and WHITE, and others known and unknown, restrained some of the apartment's occupants by binding their hands.

        c.  On or about March 6, 2008, while inside an apartment in the vicinity of 233rd Street, Bronx, New York, SCOTT and WHITE, and others known and unknown, held the apartment's residents at gunpoint and discharged a firearm.

        d.  On or about March 6, 2008, while inside an apartment in the vicinity of 233rd Street, Bronx, New York, SCOTT and WHITE, and others known and unknown, physically assaulted one of the apartment's occupants.

        (Title 18, United States Code, Section 1951.)

<u>COUNT TWO</u>

The Grand Jury charges:

3.  On or about March 6, 2008, in the Southern District of New York, ANTONIO SCOTT and O'KENE WHITE, a/k/a "Dread," the defendants, and others known and unknown, unlawfully, willfully

2

and knowingly did attempt to commit robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and would thereby have obstructed, delayed, and affected commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, SCOTT and WHITE, together with others known and unknown, attempted to commit an armed robbery of persons they believed to be in possession of narcotics and narcotics proceeds, in an apartment located in the vicinity of 233rd Street in the Bronx, New York.

(Title 18, United States Code, Sections 1951 and 2.)

<u>COUNT THREE</u>

The Grand Jury charges:

4.    On or about March 6, 2008, in the Southern District of New York and elsewhere, ANTONIO SCOTT and O'KENE WHITE, a/k/a "Dread," the defendants, unlawfully, willfully and knowingly, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, namely, the offenses charged in Counts One and Two of this Indictment, did use and carry firearms, and in furtherance of such crimes did possess firearms, and did aid and abet in the use and carrying of firearms which were brandished and discharged during the offenses referenced in Counts One and Two.

(Title 18, United States Code, Sections 924(c)(1)(A)(ii) & (iii), and 2.)

3

## COUNT FOUR

The Grand Jury charges:

5.   On or about March 6, 2008, in the Southern District of New York, ANTONIO SCOTT, the defendant, after having been previously convicted in a court of a crime punishable by imprisonment for a term exceeding one year, to wit, a conviction on or about October 28, 2003, in New York Supreme Court, Bronx County, of Criminal Sale of a Controlled Substance in the Fourth Degree, in violation of New York Penal Law 220.39, a Class C Felony, unlawfully, willfully, and knowingly did possess in and affecting commerce, a firearm, to wit, a Browning 9mm handgun which had previously been shipped and transported in interstate commerce.

(Title 18, United States Code, Section 922(g)(1).)

_____
FOREPERSON

_____
MICHAEL J. GARCIA
United States Attorney

4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

ANTONIO SCOTT, and
O'KENE WHITE,
a/k/a "Dread,"

Defendants.

## INDICTMENT

08 Cr.

(18 U.S.C. §§ 1951, 924(c)(1)(A)(iii), 922(g)(1) and 2)

MICHAEL J. GARCIA
United States Attorney.

A TRUE BILL

Foreperson.

4/23/08 - Fld. Indictment, case assigned
to Judge Baer for all purposes.
S/ Eaton, J. U.S.M.J.

**EXHIBIT B**

## 08 MAG    0589

Approved: _____
JASON B. SMITH
Assistant United States Attorney

Before:    HONORABLE HENRY B. PITMAN
United States Magistrate Judge
Southern District of New York

- - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :    SEALED COMPLAINT
                                  :
    -v.-                          :    Violation of
                                  :    18 U.S.C. § 1951;
ANTONIO SCOTT, and                :    18 U.S.C. § 924(c); and
O'KENE WHITE,                     :    18 U.S.C. § 922(g)(1)
    a/k/a "Dread,"                :
                                  :    COUNTY OF OFFENSE
            Defendants.           :    BRONX
                                  :
- - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        Detective Manuel Madera, being duly sworn, deposes and
says that he is a Detective with the New York City Police
Department ("NYPD"), and charges as follows:

### COUNT ONE

        1.  In or about March 2008, in the Southern District of
New York and elsewhere, ANTONIO SCOTT and O'KENE WHITE, a/k/a
"Dread," the defendants, and others known and unknown,
unlawfully, willfully and knowingly did combine, conspire,
confederate, and agree together with each other to commit
robbery, as that term is defined in Title 18, United States Code,
Section 1951(b)(1), and would and did thereby obstruct, delay,
and affect commerce and the movement of articles and commodities
in commerce, as that term is defined in Title 18, United States
Code, Section 1951(b)(3), to wit, SCOTT and WHITE, together with
others known and unknown, conspired to commit an armed robbery,
in the Bronx, New York, of persons engaged in narcotics
trafficking.

### OVERT ACTS

        2.  In furtherance of the conspiracy, and to effect the
illegal object thereof, the following overt acts, among others,
were committed in the Southern District of New York:

a.    On or about March 6, 2008, in the vicinity of 233rd Street, Bronx, New York, ANTONIO SCOTT and O'KENE WHITE, a/k/a "Dread," the defendants, and others known and unknown, worked together to forcibly enter an apartment in order to obtain narcotics and narcotics proceeds.

b.    On or about March 6, 2008, while inside an apartment in the vicinity of 233rd Street, Bronx, New York, SCOTT and WHITE, and others known and unknown, held the apartment's residents at gunpoint and discharged a firearm.

(Title 18, United States Code, Section 1951.)

## COUNT TWO

3.    On or about March 6, 2008, in the Southern District of New York and elsewhere, ANTONIO SCOTT and O'KENE WHITE, a/k/a "Dread," the defendants, and others known and unknown, unlawfully, willfully and knowingly, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, namely, the conspiracy to rob narcotics traffickers of narcotics and narcotics proceeds as charged in Count One of this Complaint, did use and carry firearms, and aided and abetted in the use and carrying of firearms and in furtherance of such crime did possess firearms, to wit, handguns.

(Title 18, United States Code, Sections 924(c)(1)(A)(iii) and 2.)

## COUNT THREE

4.    On or about March 6, 2008, in the Southern District of New York, ANTONIO SCOTT, the defendant, after having been previously convicted in a court of a crime punishable by imprisonment for a term exceeding one year, to wit, a conviction on or about October 28, 2003, in New York Supreme Court, Bronx County, of Criminal Sale of a Controlled Substance in the Fourth Degree, in violation of New York Penal Law 220.39, a Class C Felony, unlawfully, willfully, and knowingly did possess in and affecting commerce, a firearm, to wit, a loaded Browning 9mm handgun, which had previously been shipped and transported in interstate commerce.

(Title 18, United States Code, Section 922(g)(1).)

The bases for my knowledge and the foregoing charges are, in part, as follows:

1.    I am a Detective with the New York City Police Department ("NYPD"), and I have been personally involved in the investigation of this matter.  This affidavit is based in part upon my conversations with law enforcement agents and others and my examination of reports and records.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

2.    I have spoken to an individual ("Victim-1"), and I have learned, in substance and in part, and among other things, the following:

a.    On or about March 6, 2008, after Victim-1 entered his/her apartment building, a masked intruder came up behind Victim-1, covered Victim-1's mouth with his hand and put a gun to Victim-1's neck.  Victim-1 entered his/her apartment with the armed individual holding him/her at gunpoint.  Three other intruders, each of whom was armed with a handgun, also entered Victim-1's apartment.

b.    After entering the apartment, the four armed intruders restrained some of the apartment's occupants by binding their wrists with "zip ties."

c.    During the time the armed intruders were in his/her apartment, Victim-1 heard a gunshot in the apartment.  One of the intruders told Victim-1, in substance, "do you want me to keep shooting in here."

d.    The four armed intruders repeatedly asked Victim-1 and the other residents of the apartment, "Where's the money," and "Where's the food?"

3.    Based on my training and experience, and based on my conversations with other law enforcement personnel, I know that the term, "food," is slang term commonly used by narcotics traffickers to refer to marijuana.

4.    Based on my conversation with Victim-2, I have learned, in substance and in part, and among other things, the following:

a.    On or about March 6, 2008, the four armed intruders repeatedly beat Victim-2 about his/her head and face with their handguns, injuring Victim-2 and causing him/her to lose consciousness briefly.

b.    Victim-2 heard the four armed intruders repeatedly ask the residents of the apartment, "Where's the money," and "Where's the food?"  Victim-2 understood the term, "food," to refer to marijuana.

5.    From speaking with an NYPD police officer ("Officer-1") who participated in the investigation of the March 6, 2008 attempted robbery at Victim-1's home, and who participated in the arrests of ANTONIO SCOTT and O'KENE WHITE, a/k/a "Dread," the defendants, I have learned, in substance and in part, and among other things, the following:

a.    On or about March 6, 2008, Officer-1 and other NYPD officers responded to a radio report of a robbery in progress at Victim-1's apartment.

b.    As Officer-1 entered Victim-1's apartment building, Officer-1 saw two individuals, who were later identified as SCOTT and WHITE, running out of Victim-1's apartment.  One of the individuals that Officer-1 saw was carrying a handgun as he ran out of Victim-1's apartment. Officer-1 saw the two individuals run up the staircase, toward the roof of Victim-1's apartment building.

c.    Officer-1 and other officers climbed the staircase to the roof of Victim-1's building, following a short distance behind SCOTT and WHITE.  At the end of the staircase, Officer-1 and the other NYPD officers went onto the roof of Victim-1's apartment building, where they found SCOTT and WHITE hiding.  SCOTT and WHITE were arrested.

6.    From speaking with another NYPD police officer ("Officer-2") who participated in the investigation of the March 6, 2008 attempted robbery at Victim-1's home, I have learned, in substance and in part, and among other things, the following:

a.    While Officer-1 and other NYPD officers were following ANTONIO SCOTT and O'KENE WHITE, a/k/a "Dread," the defendants, up the stairwell to the roof of Victim-1's apartment building, Officer-2 went outside the building, in case the suspects doubled back and came out one of the building's doors.

4

      b.    While he was outside Victim-1's apartment building, Officer-2 saw an object falling from the roof of the building into the garden.

      c.    The object that Officer-2 saw falling from the roof was recovered and was found to be a loaded semi-automatic Browning 9mm handgun that was wrapped in a hooded sweatshirt (the "Browning Handgun").

      d.    A loaded semi-automatic Ruger .40 caliber handgun was recovered from inside Victim-1's apartment.

      e.    A loaded semi-automatic Smith & Wesson 9mm handgun was recovered behind a building a short distance from Victim-1's apartment building.

      f.    Plastic "zip ties" were recovered from the roof of Victim-1's apartment building, near where SCOTT was found.

7.    From speaking with an NYPD detective ("Detective-1") who participated in the investigation of ANTONIO SCOTT and O'KENE WHITE, a/k/a "Dread," the defendants, I have learned, in substance and in part, and among other things, the following:

      a.    After his arrest, WHITE was read his *Miranda* rights and he waived those rights and agreed to be interviewed by Detective-1.

      b.    In a written statement, WHITE told Detective-1 that he was inside Victim-1's apartment during the robbery, and admitted that he tied up two of the apartment's occupants.

8.    From speaking with another NYPD detective ("Detective-2") who participated in the investigation of ANTONIO SCOTT and O'KENE WHITE, a/k/a "Dread," the defendants, and from reviewing reports and records about the investigation, I have learned, in substance and in part, and among other things, that, after his arrest, SCOTT was read his *Miranda* rights and he waived those rights and agreed to be interviewed by NYPD officers.

9.    On or about March 6, 2008, I interviewed ANTONIO SCOTT, the defendant, and SCOTT told me, in sum and substance and among other things: (a) as SCOTT was running out of Victim-1's apartment with WHITE, WHITE gave SCOTT the Browning Handgun; and (b) "after I got up to the roof I took my blk hoody and the gun and threw it don't [sic] know where it landed."

10.    Based on my conversation with an Alcohol, Tobacco and Firearms official with experience and expertise in where different types of firearms are manufactured, I know that the Browning Handgun has never been manufactured in the State of New York.

11.    From reviewing the criminal record of ANTONIO SCOTT, the defendant, I know that he has been previously convicted in a court of a crime punishable by imprisonment for a term exceeding one year, specifically, a conviction on or about October 28, 2003, in New York Supreme Court, Bronx County, of Criminal Sale of a Controlled Substance in the Fourth Degree, in violation of New York Penal Law 220.39, a Class C Felony.

WHEREFORE, the deponent respectfully requests that a warrant issue for the arrest of  ANTONIO SCOTT and O'KENE WHITE, a/k/a "Dread," the defendants, and that they be arrested and imprisoned, or bailed, as the case may be.

Detective Manuel Madera
New York City Police Department

Sworn to before me this
18th day of March, 2008.

HONORABLE HENRY B. PITMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

6

**EXHIBIT C**

3/7/08    TIME: 0125    LOCATION: 47pct. DETECTIVE SQUAD OFFICE

: Okene White    D.O.D. 3/12/82    PHONE# 347-265-4219

RESS: 742 E 231 Street

1. You have the right to remain silent and refuse to answer questions.
   Do you understand question #1?
   Subject replied: Yes OW

2. Anything you do say may be used against you in a court of law.
   Do you understand question #2?
   Subject replied: Yes OW

3. You have the right to consult an attorney before speaking to the police
   and have an attorney present during any questioning now or in the future.
   Do you understand question #3?
   Subject replied: Yes OW

4. If you can not afford an attorney, one will be provided for you without
   cost.
   Do you understand question #4?
   Subject replied: Yes OW

5. If you do not have an attorney available, you have the right to remain
   silent, until you have had an oppertunity to consult with one.
   Do you understand question #5
   Subject replied: Yes OW

6. Now that I have advised you of your rights, are you willing to answer
   questions?
   Subject replied: No OW

GIVEN BY: Det Sikorski    SUBJECT SIGNATURE: Owhitpke

THE SUBJECT MADE THE FOLLOWING STATEMENT ON _____ AT

IME COMPLETED: 0155

NTE COMPLETED: 3/7/08

SUBJECT SIGNATURE: Owhitpke

DETECTIVE SIGNATURE: _____

PAGE ____ OF ____

00075

SUBJ: ANTONIO SCOTT                                DETECTIVE SQUAD   OFFICE
DRESS: 4217 WICKAM AVE        D.O.B. 10/28/85       PHONE 718 882-0996
                                  PH

You have the right to remain silent and refuse to answer questions.
Do you understand question #1?                    Subject replied: YES

Anything you do say may be used against you in a court of law.
Do you understand question #2?                    Subject replied: YES

You have the right to consult an attorney before speaking to the police
and have an attorney present during any questioning now or in the future.
Do you understand question #3?                    Subject replied: YES

If you can not afford an attorney, one will be provided for you without
cost.
Do you understand question #4?                    Subject replied: YES

If you do not have an attorney available, you have the right to remain
silent, until you have had an opportunity to consult with one.
Do you understand question #5                     Subject replied: YES

Now that I have advised you of your rights, are you willing to answer
questions?                                        Subject replied: NO

EN BY: DET. Belle                    SUBJECT SIGNATURE: _____

SUBJECT MADE THE FOLLOWING STATEMENT ON _____ AT _____

*(handwritten diagonal text: Refused)*

COMPLETED: _____
COMPLETED: _____                  SUBJECT SIGNATURE: _____
                                     DETECTIVE SIGNATURE: _____
                    PAGE ____ OF ____

**EXHIBIT D**

1220
47 PCT 2nd Floor
Squad Interview Rm.

Scott, Antonior
DOB 10/28/85  (22)
4217 Wykham # 1

Antonio Scott, Dread appreached me
on 3/6/08 around 6:30 PM, They told
me that this guy "black" owed me
some money, I was told all you
got todo is studup and watch out,
Dred was under neath the steps
The Lady came in then he grabbed her
then he put her Face down on Floor
then two other guy's came in from out side
("short man") And (T) entered apt
and grabbed girl. Dont know who
fired gun. Dread tide up the kids
And grandma. Dread came saying and
asking "wheres the money that your sm
got for me". Grandma said he moved
it, its not there, Dread said wheres
the food "weed", Grandma stated that
he moved it.
Police came in Me and Dread ran
up the stairs, went towards the roof
and Dread gave me a gun to run with
as soon as I got up to the roof
I took my blk hoody and the gun and
threw it dont know where it landed.

Methe [redacted]  x [signature]

"SHortmen" Dark skin, 5'5", 150
224 + white plains Rd.  (sells weed)

Det. E. [redacted] #[redacted]

"T-" SHT 5'5" Dark skin 150

00073

Date 3/7/08    Time 0130 Started    Location 47 Pct Sq Rm

On 3/6/08 Arinfa

On 3-6-08 We enter the apartment at about 9:20 pm all I do was tie the kids up for there safety and kept them inside the kitchen where I was with them for the whole time I was there. The other was inside the room. We got arrested about maybe 9:30 pm – 8:40 pm I am not sure what time it was to be exact. It was at 655 East 233 Street first flo

Time Ended 0155 Hrs
Date Ended 3/7/08

Det Sikorski
Okene White



00076

DATE: 3/7/08

Time 0100

LOCATION 47 PCT SQ RM

Postive ID As one of The

Perps THAT were Inside of

655 E 233 ST (Home Invasion)

ID MADE BY OKENE WHITE

a *Okenie White*

DeT Sikorski

SHEILO# 6352

00077

EXHIBIT E



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

May 6, 2008

BY OVERNIGHT DELIVERY

Curtis J. Farber, Esq.
350 Broadway
10th Floor
New York, NY 10013

  **Re:** ***United States v. Antonio Scott***
    **08 Cr. 360 (HB)**

Dear Mr. Farber:

  This letter provides supplemental discovery pursuant to Rule 16(a) of the Federal Rules of Criminal Procedure ("Fed. R. Crim. P."). Copies of the following materials, stamped with the control numbers 00078 through 00081, are enclosed:

  1. photographs of the guns recovered by the NYPD; and

  2. additional copies of NYPD Property Clerk's Vouchers numbered P046159, P046161 and P046162.

  I also write to inform you of certain oral statements made by the defendants to law enforcement officers. When he was approached by NYPD officers on the roof where he was subsequently arrested, Scott motioned toward where White was hiding and stated, in substance, "He did it. He was holding me hostage." On or about March 7, after having been advised of his *Miranda* rights after his arrest, and after waiving those rights and agreeing to be interviewed by NYPD officers and detectives, in addition to the written statement provided above, White stated, in sum and substance, the following: On or about March 6, White was walking outside near the apartment where the robbery occurred. While he was walking, White saw some young men who he recognized from his neighborhood and with whom he played basketball. The young men told White to come into an apartment (*i.e.*, the apartment where the robbery took place). After going into the apartment, White noticed a girl on the floor and White went over to try to keep the

children calm so that the others would not hurt them.  After White noticed that the other young men were wearing masks on their faces, he put his own green bandana on his face as a mask.

Very truly yours,

MICHAEL J. GARCIA
United States Attorney

by: _____
Jason B. Smith
Assistant United States Attorney
(212) 637-1026

Encls.

EXHIBIT F

Antonio Scott:

Another guy approached me on 3/6/08 around 6:30 p.m., they told me that this guy "black" owed me some money, I was told all you got to do is stand up and watch out.  The guy who approached me was underneath the steps, the lady came in then he grabbed her then he put her face down on floor then two other guys came in from outside and entered apt and grabbed girl.  Don't know who fired gun.  The guy who approached me came saying and asking "where's the money that your son got for me."  Grandma said he moved it, it's not there.  The guy said where's the food "weed"  Grandma stated that he moved it.

Police came in we ran up the stairs went towards roof and the guy gave me a gun to run with as soon as I got up to the roof I took my blk hoody and the gun and threw it don't know where it landed